F. Payson and Mary K. Todd v. Commissioner.
Todd v. Commissioner
Docket No. 646-64.
United States Tax Court
T.C. Memo 1966-212; 1966 Tax Ct. Memo LEXIS 71; 25 T.C.M. (CCH) 1099; T.C.M. (RIA) 66212; September 28, 1966
*71 Held, on the facts presented: (1) That petitioner did not realize ordinary taxable income upon the receipt of 10,000 shares of Javelin stock in January 1956, or upon the receipt of 7,000 shares in July 1957; (2) That 2,000 shares of Javelin stock received by petitioner in June 1956 and 2,000 shares received in October 1957 were not gifts and that petitioner realized ordinary taxable income upon the receipt of such shares to the extent of the fair market value at the time they were received. F. Lee Bailey, for the petitioners. Frederick A. Griffen, for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in the income taxes of petitioners and additions to tax for the years and in the amounts as follows: Additions to Tax
Sec. 6653(b),
Year
Deficiency
I.R.C. 1954
1955
$ 422.42
$ 211.21
1956
39,876.82
19,938.41
1957
157,831.85
78,915.93
1958
102,559.66
51,279.83
*72 Respondent has conceded certain adjustments in the statutory notice, including the additions to tax for fraud under section 6653(b) of the 1954 Code, and a net operating loss carry-forward deduction in the amount of $6,464.18 for the year 1956. Certain other adjustments have been conceded by petitioners. The remaining issues are whether petitioner F. Payson Todd realized taxable income in 1956 and 1957 upon the receipt of certain shares of Canadian Javelin, Limited, common stock. Findings of Fact Some of the facts have been stipulated. The stipulations of fact and exhibits attached thereto are incorporated herein by this reference. Petitioners are husband and wife who at all times material hereto resided in Rowley, Massachusetts. They filed their joint Federal income tax returns for the calendar years 1955, 1956, 1957, and 1958 on the cash basis of accounting with the district director of internal revenue at Boston, Massachusetts. Mary K. Todd is a party hereto solely by reason of having filed a joint return with her husband, F. Payson Todd, hereinafter referred to as petitioner. During the years in issue petitioner was registered with the Securities and Exchange Commission *73 as an investment adviser and was the owner, publisher and editor of the New England Counsellor, an investment service, engaged in analyzing stock market trends and reporting its analyses through a weekly letter to its subscribers. The subscription rate for this service was $35 for three months, $60 for six months, and $100 for a full year. During the years 1955, 1956, and 1957, petitioner employed from seven to fifteen persons engaged in doing technical research or as clerical employees. Petitioner himself wrote the New England Counsellor letter, supervised the research projects, handled advertising and answered correspondence. Whenever he found a stock which he thought was particularly attractive as an investment, petitioner would recommend it to his subscribers. Over the years preceding those in issue petitioner had recommended investment in a number of corporations including Mesabi Iron, the stocks of which had later increased materially in value. Petitioner operated the New England Counsellor as an individual proprietorship from May 1, 1939 through October 1958. Canadian Javelin, Ltd. (hereinafter referred to as Javelin), is a corporation organized and existing under the *74 laws of the Dominion of Canada, with its principal office in Montreal, Canada. In 1955, the authorized common stock of Javelin was 5,000,000 shares. This was increased to 12,000,000 shares in 1957. In August 1955, it had approximately 2,500,000 shares outstanding and in July 1957 it had approximately 4,600,000 shares outstanding. Its stock was listed on the Edmonton Stock Exchange in Canada and was traded over-the-counter in Canada and New York. At present its stock is listed on the American Stock Exchange. During the years in issue, John C. Doyle, a resident of Greenwich, Connecticut, was president and chairman of the board of directors of Javelin and Frank Trasnik was its secretary. Robert Sherwood was Doyle's secretary. [1]
Javelin was initially organized in 1951 as the Canadian Javelin Foundries & Machine Works, Ltd., to take over an iron casting and hollow-ware business, along with the *75 assets of which it acquired certain titaniferous iron properties along the Saguenay River in the Province of Quebec. During the next two years, in addition to operating the iron casting and hollow-ware business, it engaged in activities to prove up its Saguenay River properties, estimated to contain more than 30 million tons of titaniferous iron ore. In 1953, Javelin acquired leasehold rights in the iron ore deposits near Lake Wabush in south central Labrador, hereinafter referred to. The Newfoundland and Labrador Corporation (hereinafter referred to as NALCO) is a corporation created by the government of Newfoundland in 1951 to promote the industrial and economic development of the province. Prior to April 1958, over 80 percent of its outstanding capital stock was owned by the government of Newfoundland. NALCO's principal asset is a 25,000 square-mile concession from the government of Newfoundland containing varied mineral deposits and an estimated $100,000,000 worth of timber. In 1953, Javelin, then known as Canadian Javelin Foundries & Machine Works, Ltd., acquired a block of NALCO stock and obtained a concession of 2,300 square miles in south central Labrador with rights to *76 lease mineral deposits therein. The area contained an iron ore range 55 miles long by one to four miles wide described as one of the largest deposits of high grade iron ore ever discovered. By July 1955, Javelin had obtained a lease of mineral rights in a 5.6 square-mile area near Lake Wabush and had spent approximately $2,500,000 exploring and proving that ore. The ore is located near the surface, averages 38 percent iron, contains negligible impurities and, because of its friability, can be purified economically to a high grade of concentrate - approximately 65 percent. In July 1955, Javelin had plans to build a town site, concentrating plant and airfield at its Lake Wabush properties, a 45-mile railroad to connect its properties with the Quebec, Labrador and North Shore railroad runing to Seven Islands, Quebec, at the mouth of the St. Lawrence, and docks and loading facilities at Seven Islands. In August 1955, it let a $10,500,000 contract to McNamara Construction Company of Toronto, Canada, for construction of the railroad and Lake Wabush facilities, but in November 1955 McNamara withdrew its labor and equipment and later filed suit for costs. On September 23, 1955, the government *77 of Newfoundland guaranteed a $16,500,000 bond issue to finance the building of the railroad and two members of the Newfoundland cabinet were elected to Javelin's board of directors. The bond issue was later underwritten by a Canadian bank and was approved by Javelin's shareholders at a meeting in May. 1956. Javelin originally estimated that the railroad would be operational by the spring of 1956, but construction was not approaching completion in June 1957. In April 1956 Javelin obtained contracts with German and English steel interests for the sale of three million tons of iron ore a year for 15 years beginning in 1958, with some deliveries to be made in the fall of 1957. In October 1956 Javelin subleased part of its 5.6 square-mile lease near Lake Wabush to Pickands Mather & Company (hereinafter referred to as Pickands Mather) of Cleveland, Ohio, and the Steel Company of Canada (hereinafter referred to as Stelco) on a royalty basis. In June 1957, the government of Newfoundland entered into an agreement with Javelin, Pickands Mather, Stelco and certain United States steel companies for the sale of the government's interest in NALCO to Javelin and four other parties for $1,200,000. *78 Under this agreement, Pickands Mather and Stelco continue to have the right to mine and pay royalties on the Lake Wabush iron ore previously leased to them by Javelin, and Pickands Mather agreed to develop for Javelin the portion of its original lease not subleased to Pickands Mather and Stelco. Pickands Mather, Stelco and the United States steel companies have the right to explore and are obligated to drill ore bodies discovered in the remainder of Javelin's original concession. The agreement provided further that ownership of the Wabush Lake Railway Company, previously incorporated by Javelin to construct and operate its proposed railroad, would be divided among the participating steel companies, with Javelin retaining ten percent of its capital stock. Pickands Mather would control the railroad and build dock facilities at Seven Islands. The purchase of the government's 900,000 shares of NALCO by the Javelin group occurred on or about April 3, 1958. Petitioner first heard of Javelin on July 14, 1955. On that date a subscriber of the New England Counsellor service, interested in transporting iron ore by ship from Canada to New England ports for transshipment to Pittsburgh by rail, *79 sought petitioner's assistance in locating Doyle and delivering a message. Petitioner located Doyle at the Drake Hotel in New York and delivered the message. In the course of their conversation, Javelin and its iron ore holdings were discussed. Doyle told petitioner Javelin was well financed and in position to deliver a million tons of iron ore a year to the Jones & Laughlin Steel Corporation, which petitioner had named as a potential purchaser, and authorized petitioner to negotiate for such a contract. Thereafter petitioner contacted Carl Henning, ore purchasing agent for Jones & Laughlin, and for several days prior to July 20, 1955, relayed messages between Henning and Doyle. Henning expressed an interest in purchasing one million tons of ore a year for a period of ten years and requested delivery of ten to thirty tons of ore for testing purposes. Javelin was unable to deliver the samples requested and in February 1956, Jones & Laughlin entered into a contract to purchase iron ore from another company located approximately five miles from Javelin's property. The standard broker's commission which petitioner had expected to receive upon the sale of iron ore by Javelin to Jones & *80 Laughlin was twenty-five cents per ton. Petitioner was very disturbed over the failure of Javelin to obtain the Jones & Laughlin contract which he attributed to misrepresentation by Doyle as to the financial strength of Javelin and its inability to deliver the sample ores to Jones & Laughlin for testing. In a meeting with Doyle in the Javelin offices in April or May 1956, petitioner expressed his disappointment in not receiving a commission on the proposed sale to Jones & Laughlin. Thereafter, in June 1956, petitioner received by mail from Frank Trasnik, then treasurer of Javelin, two 1,000-share certificates of Javelin stock, the fair market value of which was $30,750,00. Petitioner made no payment for these shares of stock. In another meeting with Doyle in New York in September 1957, petitioner again expressed his disappointment over the failure of Javelin to obtain the Jones & Laughlin contract. In this and another meeting with Doyle in New York in October 1957, petitioner was made aware of dissension which was taking place among the management of Javelin. Still later in October petitioner received a call from the Montreal office of Javelin requesting that he make a reservation *81 for Eves Vincent at the Statler Hotel in Boston and meet him there. Petitioner did as requested and at the meeting with Vincent, the latter gave him twenty 100-share certificates of Javelin stock. Petitioner had never met Vincent before but understood he was connected in some way with Javelin. Vincent offered no explanation as to why the stock was being given to petitioner and petitioner did not ask for any. The 2,000 shares had a fair market value at that time of $38,500.00. Petitioner made no payment for these shares of stock. During one of his conversations with Doyle in July 1955, concerning the proposed purchase of iron ore by Jones & Laughlin, Doyle requested petitioner to "assess" Javelin's stock by his investment formula and project its probable price ranges. When he later delivered the results of his analysis to Doyle, petitioner asked if he might make the information known to his subscribers. Petitioner had originally intended to charge $5,000 for his analysis of the Javelin stock, but upon being given permission to use the information in his investment advisory service, he decided to charge only $500, which amount was paid to him by Javelin. On or about July 19, 1955, petitioner *82 had received from Javelin a copy of a letter sent to investment advisers and brokers enclosing an economic report prepared by Professor David W. Slater of Queen's University, Kingston, Ontario, Canada, relating to the Lake Wabush iron ore deposit of Javelin. Petitioner secured several hundred copies of this report. In his New England Counsellor letter of July 22, 1955, he informed his subscribers he was considering a low-priced "special situation" which seemed to have potentialities equivalent to those of Mesabi Iron, and that he would mail pertinent data and price projections if it passed his final screening tests. In a letter dated July 23, 1955, petitioner enclosed copies of the Slater report and recommended the purchase of Javelin common stock for a "long-pull speculative holding." In the light of Javelin's prospective production of three million tons of ore per year beginning in 1957, he suggested a buying range of between 13 and 22 for the first year of production, 17 to 28 for the second year, and 22 to 33 for the third year, with liquidation ranges of 30 to 38, 40 to 53, and 49 to 65, respectively. Thereafter, through October 1958, petitioner continued to recommend the purchase *83 of Javelin stock as a long-term speculative investment. Twelve issues in 1955, thirteen in 1956, eighteen in 1957, and twenty-two in 1958 related to Javelin. Numerous issues of the New England Counsellor letters contained reproductions or summaries of articles appearing in both Canadian and United States newspapers and trade journals relating to the potentialities of Javelin's iron ore properties, the construction and financing of railroad and other facilities, contracts with German and English steel interests at well as with Pickands Mather, Stelco and certain United States steel companies. The potentialities of Javelin were frequently referred to as "fantastic." In April 1956, based upon reports that Javelin's production potential might be increased from three million to six million tons annually, petitioner suggested to his subscribers that the previously recommended "over-priced" range at which purchasers should liquidate or reduce their Javelin stock holdings, should be increased from $49 to $75 per share, to $98 to $130 per share. In October 1956 he recommended a further increase in the "over-priced" range to $125 to $163 per share. Beginning in 1956 and continuing in 1957, *84 there was extensive criticism of Javelin's prospects by opposing interests and Canadian brokers. Petitioner received numerous inquiries from subscribers and spent time and money in obtaining facts to refute unfavorable claims. In December 1956 he "retained the services of an independent eminent economist to check carefully into the records of CANADIAN JAVELIN," who reported to him "I am completely satisfied with the statement of ore reserves and with the working out of the mining, milling, and pelletizing problems. * * * I have a very deep respect for the way in which this work has been handled." On January 24, 1957, petitioner circulated a reprint of an article which had appeared in Barron's National Business and Financial Weekly, questioning Javelin's management and ability to meet its contracts, together with his comments on various portions of the article. Petitioner continued to recommend purchase of Javelin stock "at-the-market," in 1957 and 1958. In May 1957, he offered explanations of past price fluctuations in the stock. On July 25, 1958, the Securities and Exchange Commission placed Javelin on its Canadian Restricted List barring trading in its stock by broker-dealers in *85 the United States. In answer to inquiries made by subscribers of the New England Counsellor service, petitioner advised them he had not changed his mind as to the profit potential of Javelin's common stock and reaffirmed his previously recommended over-price areas. Javelin was removed from the Canadian Restricted list by the SEC on October 7, 1958. Petitioner reported this action and on October 22, 1958, announced his answering of inquiries would be curtailed due to impending relocation of his offices. The SEC revoked petitioner's registration as an investment adviser on October 29, 1958, and on or about November 1, 1958, petitioner's investment advisory service business was incorporated as the New England Counsellor, Inc. On November 28, 1960, petitioner pleaded nolo contendere to an indictment charging use of the mails and engaging in transactions, practices and a course of business, which operated as a fraud and deceit upon clients and prospective clients, and was sentenced to six months in jail and fined $10,000. The jail sentence was suspended and petitioner was placed on probation for three years. The charges arose out of petitioner's activities in connection with Javelin *86 stock, in violation of sections 77q(b) 80-b-6(1) and (2) of Title 15 of the United States Code. In addition to publishing the New England Counsellor letters, petitioner frequently sent telegrams to his subscribers in 1956 and 1957 recommending that they buy Javelin stock. In 1956 Javelin sent petitioner a check in the amount of $3,767.76 to cover the cost of these telegrams. Petitioner did not report the receipt of this income on his income tax return for 1956. In July 1955, Javelin stock was selling for approximately $3.75 per share. Thereafter it would rise for a period and then decline for a period. Thus, during 1956, it rose to $11 on January 10 and dropped to $6 on January 23; it rose to $17 on April 30 and dropped to $12.50 on May 28; it rose to $20.50 on July 18 and dropped to $17 on July 26; it rose to $26 on August 17 and dropped to $18.50 on September 14; it rose to $27.75 on October 15 and dropped to $20.50 on October 31. It reached its peak price of about $30 per share prior to July 1, 1957. It apparently fluctuated considerably after 1957. In 1958 it dipped to $6 a share and at the time of trial was selling for slightly more than $9 a share. During one of his conferences *87 with Doyle in July 1955, petitioner discussed with Doyle the purchase of 10,000 shares of Javelin stock. He later discussed the purchase of such stock with Robert Sherwood, Doyle's secretary, and in early August 1955 drew a demand note pre-dated August 1, 1955 in favor of Jacques Gagnon in the amount of $42,500 with interest at the rate of 3 1/2 percent per annum. On the back of the note petitioner wrote the following: This note is given in consideration of my purchase from you of 10,000 shares of Canadian-Javelin. Payment to be made on your demand. JPT Gagnon's connection with Javelin is not shown. The note was drawn in his favor on Sherwood's instructions. Before signing the note petitioner discussed the stock purchase with Ralph Loomis, an elderly friend from whom he had previously obtained financial assistance, who told him to sign the note and that he (Loomis) could obtain the money with which to pay it within two or three weeks. On January 23, 1956, Gagnon made written demand on petitioner for payment of the note and on January 25, 1956, petitioner sent Gagnon a check for $43,217.26 in payment of the principal amount of the note plus 3 1/2 percent interest. Shortly thereafter, *88 in January 1956, petitioner received a certificate for 10,000 shares of Javelin stock, the fair market value of which at that time was $74,166.66. Petitioner borrowed the money to pay the note from Loomis. In August 1955, petitioner purchased 200 shares of Javelin stock, at the market price, through the firm of Morgan and Company of Montreal, Canada. In January or February 1956, petitioner purchased 250 shares of Javelin stock, at the market price, through Ladlow and Company of Boston, Massachusetts. At the time he arranged to purchase the initial 10,000 shares, petitioner also discussed with Sherwood the purchase of an additional 10,000 shares thereafter at the same price. He attempted to discuss this matter with Sherwood on a number of occasions in 1956 and 1957 but each time Sherwood refused to discuss it. Finally, in April or May 1957, it was agreed petitioner might purchase 7,000 shares of Javelin stock at the July 1955 market price and on or about July 10, 1957 petitioner executed a demand note pre-dated July 28, 1955, in favor of Jacques Gagnon, in the amount of $28,000 with interest thereon at the rate of 3 1/2 percent per annum. On the back of this note petitioner wrote *89 an endorsement similar to the one on the first note except that it referred to 7,000 shares. Gagnon made demand for payment of this note by letter dated July 17, 1957, and on July 24, 1957 petitioner sent Gagnon a check for $29,933.15, representing the face amount of the note plus 3 1/2 percent interest from July 28, 1955, and, in July 1957, received six 1,000-share certificates and two 500-share certificates of Javelin stock having a then fair market value in the aggregate amount of $183,812.50. Petitioner also borrowed the money with which to discharge this note from Loomis. The 21,000 shares of stock received by petitioner from Javelin were disposed of as follows: Two thousand two hundred shares of the 10,000-share certificate received by petitioner in January 1956 were sold in 1964 to satisfy an indebtedness owed by petitioner to a party by the name of Streif. The remaining 7,800 shares are held by the District Director of Internal Revenue pursuant to a jeopardy assessment. Petitioner reported the difference between the amount he had paid and the amount for which the 2,200 shares were sold as capital gain on his 1964 return. Three thousand of the 7,000 shares received by *90 petitioner in July 1957, were sold by petitioner to Loomis shortly thereafter at the same price paid therefor by petitioner; three thousand shares pledged to secure a loan from a bank were sold by the bank in 1963; and one thousand shares were allegedly appropriated by another party. Petitioner reported as capital gain on his 1963 return the difference between the amount he had paid for the 3,000 shares sold by the bank and the amount for which they had been sold. One thousand of the 2,000 shares delivered to petitioner by Trasnik in June 1956 were given by petitioner to Loomis and the remaining 1,000 shares were placed by petitioner in a strongbox. The ultimate disposition of these 1,000 shares is not clearly shown. Petitioner did not file a gift tax return for the 1,000 shares given to Loomis in 1956. Petitioner also gave Loomis 1,000 of the 2,000 shares delivered to him by Vincent in October 1957, and the remaining 1,000 shares were sold by petitioner's attorney in 1957 for $14,750. The attorney retained $4,750 in payment of legal fees owed him by petitioner and gave petitioner a check for the remaining $10,000. Petitioner reported the $10,000 received from the attorney as income *91 on his 1958 return. The $4,750 retained by the attorney was not reported as income by petitioner nor did petitioner claim a deduction for such amount. Petitioner did not file a gift tax return for the 1,000 shares given to Loomis in 1957. Petitioner did not report any income as the result of the receipt of the 21,000 shares of Javelin stock in either of his returns for 1956 and 1957. In his statutory notice of deficiency dated November 21, 1963, respondent determined that in 1956 petitioner "realized income from the receipt of 12,000 shares of Canadian Javelin, Ltd. stock to the extent the fair market value of the stock, when received, exceeded your basis." A similar determination was made for 1957 with respect to 9,000 shares received in that year. There was no agreement, express or implied, between petitioner and representatives of Canadian Javelin, Ltd., whereby petitioner was to be allowed to purchase Javelin stock at July or August 1955 market prices in return for his recommending the purchase of Javelin stock by the subscribers to the New England Counsellor letter. The excess of the fair market value over the price paid by petitioner for the 10,000 shares of Javelin stock *92 received by him in January 1956, or the 7,000 shares received by him in July 1957, did not constitute ordinary income taxable to the petitioners. The 2,000 shares of Javelin stock received by petitioner in June 1956 and the 2,000 shares of Javelin stock received by him in October 1957, were not gifts. The fair market value of the 2,000 shares received by petitioner in June 1956, and the fair market value of the 2,000 shares received in October 1957, represented compensation paid to petitioner in return for his efforts to procure a contract from the Jones & Laughlin Steel Corporation for the purchase of iron ore from Javelin, and as such constitutes ordinary income taxable to the petitioners in the years received. Opinion The only issues presented herein are whether petitioner realized ordinary taxable income upon the receipt of 10,000 shares of Javelin stock in January 1956 and the receipt of 7,000 shares in July 1957, to the extent that the fair market value of such shares of stock at the time received by him exceeded the price paid for them by petitioner, and whether petitioner realized ordinary taxable income upon the receipt of 2,000 shares of Javelin stock in June 1956 *93 and 2,000 shares in October 1957, to the extent of the fair market value of such shares at the time they were received by him. These issues are strictly factual and are to be determined from all the facts and circumstances presented. Respondent contends that the excess value of the 10,000 shares received by petitioner in January, 1965, and the 7,000 shares received by him in July, 1957, over the respective purchase price paid by petitioner for such stock was compensation for services rendered by petitioner in publicizing and recommending the purchase of Javelin stock through his investment service letters. On brief, respondent states that "in July, 1955 the petitioner was retained by Canadian [herein referred to as Javelin] to advertise its stock in an attempt to increase its current selling price on the market." Respondent further contends that the fair market value of the 2,000 shares received by petitioner in June 1956, and the 2,000 shares received by him in October 1957, was compensation for such services or for his services in connection with the attempted sale of iron ore to the Jones & Laughlin Steel Corporation. Petitioner contends that both the 10,000-share and 7,000-share *94 purchases resulted from an agreement which Sherwood and Doyle made with him in July 1955, to permit him to purchase an initial 10,000 shares, and an additional 10,000 shares at July-August 1955 market prices, and that each of the 2,000-share blocs received by him in June 1956 and October 1957, were gifts. We find no merit in respondent's contentions respecting the 10,000 shares and the 7,000 shares received by petitioner in January 1956, and October 1957, respectively. On the other hand, we find no merit in petitioner's contention that each of the 2,000 shares received by petitioner in June 1956, and October 1957, respectively, represented gifts. On the contrary, we agree with respondent that each of these two 2,000-share blocs were delivered to petitioner as compensation for his efforts to negotiate a sale of iron ore to Jones & Laughlin. Respondent bases his contentions concerning the 10,000 and 7,000 shares primarily upon the glowing reports and favorable recommendations regarding the purchase of Javelin stock which were made by petitioner in 65 issues of the New England Counsellor letter sent to its subscribers during the period July 22, 1955 to October 22, 1958, inclusive, *95 upon the fact that petitioner sent numerous telegrams to subscribers recommending the purchase of Javelin stock, for which telegrams he was in part reimbursed by Javelin, and upon the time and money spent by petitioner in obtaining material with which to refute criticisms being made of Javelin and its management. There is no written agreement evidencing petitioner's retention by Javelin or its representatives to publicize Javelin or to recommend the purchase of its stock. Respondent would have us imply such a contract solely on the basis of the New England Counsellor letters which the petitioner sent his subscribers, the fact that he sent numerous telegrams recommending the purchase of Javelin stock at then market prices, and that he spent considerable time and effort in obtaining information with which to refute unfavorable criticism. We have carefully read and considered each of the 65 issues of the New England Counsellor letters placed in evidence by respondent. There is no question but that they painted a favorable picture of Javelin and its future growth as a major producer of iron ore, and that petitioner consistently recommended the purchase of its stock as a long-term investment. *96 We do not think, however, that these letters or the other factors mentioned are sufficient in and of themselves to justify the conclusion that there was an agreement between petitioner and representatives of Javelin that petitioner would be given favorable treatment in the purchase of Javelin stock in return for his publicizing and recommending the purchase of Javelin stock to his subscribers. Petitioner had been in the investment advisory service business since May 1939. He was constantly on the alert for investment opportunities which he might recommend to his subscribers. Many of the persons employed by him were engaged in analyzing stock market trends and studying the growth potentials of numerous corporations. Over the years he had recommended the purchase of stock in a number of corporations, including Mesabi Iron, whose stock had later substantially risen in market price. Petitioner first learned of Javelin in July 1955, through a subscriber, interested in obtaining contracts to transport iron ore from Canadian to New England ports, who sought his assistance in locating Doyle, the president of Javelin. He located Doyle in New York and, after delivering the subscriber's message, *97 entered into a discussion of Javelin and its iron ore holdings. He also inquired if Javelin was in position to deliver a million tons of iron ore a year to an American steel company which he would name. Doyle assured petitioner Javelin was not in need of financing and was in position to deliver such ore. Upon being told Jones & Laughlin was the steel company petitioner had in mind, Doyle authorized petitioner to enter into negotiations for such a contract. Thereafter, petitioner contacted Henning, ore purchaser for Jones & Laughlin, and acted as an intermediary between Henning and Doyle. The contract did not materialize because Javelin failed to deliver 10 to 30 tons of ore which Henning had requested for testing purposes, and in February 1956 Jones & Laughlin entered into a contract to purchase iron ore from another company located near Javelin's property. During one of his early conversations with Doyle concerning the Jones & Laughlin purchase, Doyle requested petitioner to make an analysis of Javelin's stock and project its probable price range. Petitioner did so and, upon delivering the results of his analysis, requested permission to use the information in the letters to his *98 subscribers. On July 19, 1955, petitioner had also received an economic report prepared by Professor Slater of Queen's University relating to the commercial feasibility for immediate development of the Lake Wabush iron ore deposits of Javelin, wherein the professor had concluded that the Lake Wabush deposit met all tests for immediate development, including the demand and revenue situation, cost of mining, concentration and delivery of the product, the profitability of the mining operations, the self-sufficiency of the new railroad construction and future possibilities. Thereafter, on July 23, 1955, petitioner began to recommend to his subscribers that they purchase Javelin stock "for an intelligent long-pull speculative holding." He continued to recommend the purchase of Javelin stock through October 1958. Numerous issues of the New England Counsellor letters contained reproductions or summaries of articles appearing in both Canadian and United States newspapers, financial magazines and trade journals relating to the potentialities of Javelin's iron ore properties, the construction and refinancing of railroad and other facilities, the support both financial and otherwise given by *99 the government of Newfoundland, and contracts with German and English steel interests as well as with Pickands Mather, Stelco and certain United States steel companies. There does not appear to have been any doubt as to the high quality and the extent of Javelin's holdings. Most of the reports appear to have been favorable and those that were critical appear to have been directed mainly at management. It is not surprising that petitioner thought he had uncovered another "Mesabi Iron" situation. Perhaps he was unduly optimistic. We are unable to imply, however, either from his letters or his other activities, that "petitioner was retained" by Javelin "to advertise its stock in an attempt to increase its current selling price on the market," or that the excess of market value over the amount paid for either the 10,000 shares or the 7,000 shares represented compensation for services rendered. It is immaterial whether there was an actual binding contract of purchase of such shares in July or August 1955 as contended by petitioner. Also, in view of our finding that the excess of market value over amount paid did not represent compensation for services rendered, it is unnecessary to discuss *100 the legal effect of the demand notes. Even if no completed contract of sale took place until the notes were paid and the stock delivered, each of the above transactions in question represented no more than a bargain purchase. As was held by the Supreme Court in Palmer v. Commissioner, 302 U.S. 63, "one does not subject himself to income tax by the mere purchase of property, even if at less than its true value, and * * * taxable gain does not accrue to him before he sells or otherwise disposes of it." See also Helvering v. Salvage, 297 U.S. 106; Manomet Cranberry Co., 1 B.T.A. 706; William J. Haag, 40 T.C. 488, 492, affd. 334 F. 2d 351 (C.A. 8, 1964). We hold for petitioner with respect to the 10,000 shares received by him in January 1956, and the 7,000 shares received in July 1957. We think a different conclusion is required, however, with respect to the 2,000 shares received by petitioner in June 1956, and the 2,000 shares received by him in October 1957. In July 1955, Doyle, then president of Javelin, authorized petitioner to negotiate with the Jones & Laughlin Steel Corporation for the sale of iron ore. Petitioner *101 thereafter contacted the ore purchaser for Jones & Laughlin, who expressed an interest in the purchase and delivery of one million tons of iron ore a year over a period of ten years and requested that ten to thirty tons of iron ore be delivered for testing purposes. Doyle had assured petitioner Javelin could deliver as much as one million tons a year to Jones & Laughlin. It failed to deliver the ten to thirty tons requested for testing purposes, however, and the deal fell through. Jones & Laughlin subsequently contracted to procure ore from another company. The standard broker's commission which petitioner had expected to receive upon the sale of iron ore by Javelin to Jones & Laughlin was twenty-five cents per ton. Understandably, petitioner was considerably disturbed over the failure of Javelin to secure such a contract, which he attributed to misrepresentation by Doyle as to Javelin's financial condition and its inability or failure to deliver the ore samples to Jones & Laughlin for testing. He expressed his disappointment to Doyle on several occasions. The 2,000 shares of Javelin stock delivered to him in June 1956 and the 2,000 shares delivered to him in October 1957, were clearly *102 not gifts, Commissioner v. Duberstein, 363 U.S. 278, but were intended as compensation for the services he had rendered in connection with the attempted sale of iron ore to Jones & Laughlin. Accordingly, the fair market value of the 2,000 shares received in June 1956, and the 2,000 shares received in October 1957, constituted taxable income received by petitioner in the respective years. We sustain respondent's determination with respect to these shares. Decision will be entered under Rule 50. Footnotes
1. The following information is abstracted from various economic, financial and engineering reports, including articles appearing in Canadian and United States newspapers and magazines, which were incorporated in the New England Counsellor letters introduced in evidence by the respondent.↩